**Richard ROBINSON, Plaintiff,**

v.

**PHOENIX HOME LIFE MUTUAL
INSURANCE COMPANY,
Defendant.**

**No. CIV. H–97–1086.**

United States District Court,
D. Maryland.

May 26, 1998.

William B. Dale, McChesney & Dale, Bowie, MD, for plaintiff.

Nell B. Strachan, Melissa F. Cordish, Venable, Baetjer and Howard, Baltimore, MD, for defendant.

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, plaintiff Richard Robinson ("Robinson") is seeking to recover benefits under his employer's long term disability plan which was insured by defendant Phoenix Home Life Mutual Insurance Company ("Phoenix"). Suit has been brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et. seq.* In a claim filed with defendant Phoenix, plaintiff asserted that he had become totally disabled during the period of his employment with General Heating Engineering Co., Inc. ("General Heating"), and he applied for benefits under General Heating's plan which was insured by defendant Phoenix. When his claim was denied, plaintiff sued defendant Phoenix in this Court, seeking a declaratory judgment and benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).[1]

The parties have engaged in extensive discovery and have now filed dispositive motions. Presently pending before the Court are a motion for summary judgment filed by plaintiff Robinson and a motion for summary judgment filed by defendant Phoenix. Lengthy memoranda and voluminous exhibits have been submitted by the parties in support of and in opposition to the pending motions for summary judgment. A hearing has been held in open Court. For the reasons stated herein, plaintiff's motion for summary judgment will be denied, and defendant's motion for summary judgment will be granted.

1. Defendant Phoenix has counterclaimed, seeking a declaratory judgment that plaintiff was not totally disabled while covered by the plan and that he is not entitled to any recovery of disability benefits.

I

*Background Facts*

Plaintiff Robinson began his employment with General Heating on February 25, 1985. While so employed, he served as Vice President of Safety and Security. In that capacity, Robinson had numerous safety, security and loss control responsibilities, including creating and setting up safety training programs, developing and managing programs to prevent the loss of property, conducting safety inspections of construction sites, purchasing vehicles and managing vehicle repair work.

While employed by General Heating, plaintiff suffered from various injuries and ailments. He had previously served as a Marine Corps pilot and had sustained several injuries while in the service. From time to time during his employment with General Heating, he was treated for back, knee and other musculoskeletal problems. During 1994, Robinson's performance began to deteriorate, and there were a number of different instances in which his employer began questioning his performance and expressed concern about his health. Conditions of his employment were questioned in a memorandum from plaintiff's supervisor dated October 14, 1994 which stated in part:

> We are very concerned with your personal health and it's affect [sic] on your behavoir [sic] during employment at General Heating. Your past behavoir [sic] has diminished your ability to manage other people. Your occasional loss of personal control at work has created a question as to your ability to emotionally handle the job.

On October 28, 1994, plaintiff's employment was terminated.[2] According to General Heating, his employer, plaintiff "was terminated from his position due to a poor job performance brought on by his irrational behavior."[3]

Following termination of his employment, plaintiff submitted to the Maryland Office of Unemployment Insurance ("the Maryland Unemployment Office") on December 14, 1994 an application for unemployment benefits. In that application, Robinson indicated that he was able to accept full time work as of the date of the application and could "work all hours, days and shifts required in the type of work" which he was seeking. He indicated a preference first for administration work and second for safety and security work. In his application, he stated that he had been discharged by General Heating because he had been out sick two times in one month with bronchitis-pneumonia and that he had been told by his supervisor that that was too much sick leave. In a form submitted to the Maryland Unemployment Office dated December 20, 1994, Dr. Arnold Kirshenbaum had certified that Robinson was able to work full time and had been released to return to work as of November 15, 1994. Plaintiff had been ill in November of 1994 and had visited Dr. Kirshenbaum on November 9, 1994. Ultimately, plaintiff was awarded $5,798 as unemployment compensation benefits by the Maryland Unemployment Office.

On or about June 7, 1996, Robinson filed with defendant Phoenix an application seeking long term disability benefits.[4] In his claim, plaintiff characterized his medical condition as "chronic generalized pain" beginning in the late 1980s and becoming "severe and chronic" in 1991. In arguments presented to the Court, plaintiff now contends that he suffered from fibromyalgia and myofascial pain syndrome.

Following receipt of plaintiff's claim, defendant instituted procedures for investigating its validity. Joseph L. Cristobal ("Cristobal"), an employee of Phoenix with the job

---

**2.** Although the last day that Robinson worked was October 20, 1994, he was paid through January of 1995.

**3.** Plaintiff Robinson was forty-four years of age when he was discharged by General Heating.

**4.** Plaintiff has contended that he in fact filed a claim for long term disability benefits with defendant in late 1994 or early 1995. According to

Phoenix, it never received a copy of that claim, and Phoenix contends that plaintiff's 1996 claim was untimely. The parties have agreed, however, that it is not necessary at this time to resolve the issue of whether plaintiff's claim for benefits was timely filed or not. The claim to be now adjudicated by the Court is therefore the one filed in 1996.

title of Technical Services Consultant, opened a file and obtained numerous medical records from physicians and health care providers listed by plaintiff in his claim. The records secured by Cristobal included reports from various doctors and hospitals and also records of the Maryland Unemployment Office relating to Robinson's application for unemployment insurance benefits. Under General Heating's plan, disability insurance coverage ceased on the date when a beneficiary was no longer an active employee. The Phoenix policy defined an employee as "totally disabled" if he is "unable to perform all the material and substantial duties of ...[his]... regular occupation."

During the course of his investigation, Cristobal met personally with a representative of General Heating and inquired as to the reasons for the termination of Robinson's employment. Cristobal also met with Dr. Robert Gerwin who had submitted two different reports in support of plaintiff's claim, one dated February 24, 1995 and a second dated February 20, 1996. Thereafter, Cristobal forwarded all the medical records which he had obtained to Dr. David Silverman, the in-house Medical Director of Phoenix. Dr. Silverman reviewed plaintiff's medical records and submitted a memorandum to Cristobal dated September 16, 1996. In that memorandum, Dr. Silverman concluded on the basis of Robinson's medical history that there was little objective medical evidence to support plaintiff's claim that he was totally disabled during the time that he was employed by General Heating.

Following his review of all the information and documents which he had collected, including Dr. Silverman's report, Cristobal determined that plaintiff Robinson was not disabled within the meaning of the plan and was not entitled to long term disability benefits. He so advised Robinson by letter dated September 20, 1996. Represented by counsel, Robinson filed an appeal of this decision with Phoenix. Cristobal thereafter denied this appeal in correspondence sent to plaintiff's attorney. This civil action was filed in this Court on April 11, 1997.

## II

### Summary Judgment Principles

As set forth in Rule 56(c), F.R.Civ.P., the standard for the granting of a motion for summary judgment is that the moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ." One of the purposes of Rule 56 is to require a party in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that it may not be liable under the claims alleged or subject to the defenses asserted. *See* Rule 56(a). The burden is on the party moving for summary judgment to show that no genuine issue of fact exists and that the movant is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir. 1984).

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick*, 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually

unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

In this particular case, both plaintiff and defendant have asserted that there are no disputed questions of fact in the record here, and each party contends that it is entitled under Rule 56 to the entry of judgment as a matter of law. Applying summary judgment principles to the facts of record here, this Court has concluded that plaintiff's motion for summary judgment must be denied and that defendant's motion for summary judgment must be granted.

## III

### Applicable ERISA Principles

In this suit brought under 29 U.S.C. § 1132(a)(1)(B), plaintiff Robinson contends that defendant Phoenix wrongfully denied him benefits under the long term disability plan of his employer General Heating. Principles applicable in a suit like this one brought under ERISA were enunciated by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In that case, the Supreme Court held that a denial of benefits challenged in a suit brought under § 1132(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. If discretionary powers are given to the administrator or fiduciary under the plan, its decisions are reviewed for abuse of discretion and will not be disturbed if they are reasonable. *Id.*

During the past few years, the Fourth Circuit has developed a "well-settled framework" for review by a court of a fiduciary's denial of benefits claimed under an ERISA plan. *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir.1997). As an initial matter, the reviewing court must determine *de novo* whether the ERISA plan confers discretionary authority on the administrator

or fiduciary and if so, whether the administrator or fiduciary acted within that discretion. *Id.* at 233; *Haley v. Paul Revere Life Ins. Co.,* 77 F.3d 84, 89 (4th Cir.1996).

■ If the reviewing court decides that the particular plan at issue vests in its administrator or fiduciary discretion to determine a claimant's eligibility for benefits, a deferential standard is to be applied. Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *Ellis,* 126 F.3d at 232; *see Bruch,* 489 U.S. at 115; *Haley,* 77 F.3d at 89. The decision of an administrator or fiduciary is reasonable if it is " 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.' " *Ellis,* 126 F.3d at 232 (quoting *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997)).

■ In support of the claim asserted by him in this case, plaintiff contends that a substantial factor which the Court must consider is that defendant Phoenix, acting as the fiduciary here, had a conflict of interest when it denied his claim for benefits. Plaintiff points out that defendant's exercise of discretion had a direct financial effect on its profitability and that defendant's resulting conflict of interest must be weighed as a factor in determining whether there has been an abuse of discretion. *See Bruch,* 489 U.S. at 115. The Fourth Circuit has also established "a well-developed framework" for consideration by a reviewing court of a conflict of interest of the sort existing in this case. *Ellis,* 126 F.3d at 233. A court must apply the conflict of interest factor on a case-by-case basis in order to lessen the deference normally given under the applicable discretionary standard of review. *Id.* However, deference should be lessened only to the extent necessary to counteract any influence unduly resulting from such conflict of interest. *Id.* In *Bedrick v. Travelers Ins. Co.,* 93 F.3d 149, 152 (4th Cir.1996), the Court, harmonizing *Bruch* and Circuit law and quoting *Bailey v. Blue Cross and Blue Shield of Virginia,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996), said the following:

[W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

In *Ellis,* the Fourth Circuit emphasized that, even if a conflict of interest existed, a court should nevertheless "in no case" deviate from the abuse of discretion standard. *Ellis* 126 F.3d at 233. Rather, the approach to be taken should be as follows:

Instead, the court modifies that abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Id.*

Accordingly, the Court in this case must determine whether the defendant's decision was based on substantial evidence and whether its review process was thorough and evinced a deliberate, principled reasoning process. *Id.* at 234. Presented with a case like this one in which the fiduciary has a conflict of interest, this Court should review the merits of the decision to determine whether it was consistent with an exercise of discretion by a fiduciary, acting free of the interests which would conflict with those of the beneficiary. *Id.* at 233; *Bedrick,* 93 F.3d at 152.

IV

*Discussion*

(a)

*The Standard of Review*

■ Plaintiff first contends that this Court in this case should review defendant's denial of benefits under the *de novo* standard enunciated in *Bruch.* Express language of the Phoenix policy does not support this contention.

At page 23, the Phoenix policy provides:

We are a fiduciary, as that term is used in ERISA and the regulations which interpret ERISA, with respect to Phoenix Home Life Mutual Insurance Company insurance plans under which you, and if applicable, your dependents are insured. In this capacity, we are charged with the obligation, and possess discretionary authority to make claim, eligibility and other administrative determinations regarding those plans.

At page 7, the policy provides that a claimant seeking benefits must provide the following proof:

Any information that is: 1. Required by us under the terms of the policy; and 2. Satisfactory to us.

The language in question clearly confers discretionary authority on Phoenix as the fiduciary to determine Robinson's entitlement to benefits under the policy. Indeed, the language in the Phoenix policy is similar to that before the Court in *Ellis,* in which case both the parties and the Court agreed that the fiduciary's denial of benefits should be reviewed under an abuse of discretion standard. 126 F.3d at 233. As the Court noted in *de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1187 (4th Cir.1989), no magic words are required to trigger the application of one or another standard of judicial review. It only need appear on the face of the plan documents that the fiduciary has been given the power "to resolve disputes over benefits eligibility..." *Id.* (citing *Bruch,* 489 U.S. at 115).

Based on language in the Phoenix policy, this Court is satisfied that the abuse of discretion standard must be applied in this case to determine whether Phoenix as the fiduciary improperly denied benefits to plaintiff Robinson.

(b)

*The Review Process*

■ Pursuant to the dictates of *Ellis,* this Court must first determine whether Phoe-

nix's decision was based on a deliberate, principled reasoning process. Cristobal was the representative of Phoenix who reviewed information pertinent to plaintiff's claim and who eventually denied it. Cristobal has had fifteen years of experience in evaluating claims for long term disability benefits and has investigated thousands of claims. He began to investigate and review plaintiff's claim on or about June 26, 1996.

Plaintiff claimed to have been totally disabled because the "onset of chronic generalized pain in late 1980's" became severe and chronic in 1991. Under the policy, an employee is "totally disabled" if he is "unable to perform all the material and substantial duties of...[his]...regular occupation."

At the outset of his investigation, Cristobal requested medical records from the physicians and health care providers listed by plaintiff in his claim.[5] Medical records from the following were obtained: Dr. Robert Gerwin, Dr. J. Richard Wells, Dr. Robert S. Viener, Dr. Robert J. Lloyd, Dr. A. Stott Carleton and Dr. Henry Holcomb.[6] In addition, Cristobal obtained records from Sibley Memorial Hospital and Georgetown University Medical Center, both of which are located in Washington, D.C. In the course of his investigation, Cristobal obtained additional information from health care providers not listed by Robinson, including records from Laurel Regional Wound Care Center, Greater Baltimore Wound Care Center and North Arundel Hospital. Income tax records from 1994 and 1995 were likewise obtained, as were unemployment compensation records from the Maryland Unemployment Office, including the certification by Dr. Kirshenbaum that plaintiff had been released to return to work on November 15, 1994.[7]

As a part of his investigation, Cristobal met with a representative of General Heating. Robinson's employer informed Cristobal that General Heating had serious concerns about Robinson's behavior and emotional state. During the course of the investigation, Cristobal also met with Dr. Gerwin. In support of his claim, plaintiff relied in particular on two reports of Dr. Gerwin which had been reviewed by Cristobal, one of which was dated February 24, 1995 and the other of which was dated February 20, 1996.[8] Neither one of these reports diagnosed plaintiff's condition as fibromyalgia or myofascial pain syndrome.

All of plaintiff's medical records which had been obtained were forwarded to Dr. David Silverman, who is Phoenix's in-house Medical Director. Dr. Silverman has seventeen years of experience as a physician and has been employed full time by Phoenix since August of 1995. Dr. Silverman reviewed all of the records submitted and undertook to determine if they provided evidence of a disabling condition. In his report to Cristobal dated September 16, 1996, Dr. Silverman considered evidence pertaining to the various ailments of plaintiff which were mentioned in his medical records, including prescription narcotic overuse, arthritis of the foot and spine, right knee problems, a vitamin B–12 deficiency, necrotizing skin lesions and plaintiff's psychological history. In his report, Dr. Silverman concluded:

> Overall, there are of [*sic*] large number of impairments claimed to be contributing to disability. Additional claims are contained in Dr. Gerwin's letter referred to above. There is objective evidence for only a few impairments, which include the right knee problems, the skin lesions, carpal tunnel syndrome, and thoracic disc disease. It is difficult to determine how much the right knee is disabling the claimant. Certainly

---

5. Plaintiff was not willing at the outset to authorize doctors and health care providers to furnish relevant information to Phoenix and specifically instructed Dr. Gerwin to personally contact him before releasing or discussing any of his medical records. Thereafter, plaintiff agreed to such release, and the records were obtained by Cristobal.

6. Some of plaintiff's medical records indicated that he was "self-employed."

7. The written materials reviewed by Cristobal have been filed as exhibits in this case. They have been submitted in three separate volumes and total more than 1,300 pages.

8. The claim file also contained an earlier report of Dr. Gerwin dated March 30, 1993.

the x-rays are not remarkable and one physician at least felt that the claimant's symptoms were exaggerated. The skin lesions were felt to be self-inflicted by several examiners. His carpal tunnel syndrome is very mild and would not be considered disabling. The thoracic disc disease does not seem significant. *Thus there is little objective medical evidence to support disability on a non-mental basis.* There do appear to be major pyschosocial issues at play here as well. (Emphasis added)

In his four-page letter to Robinson dated September 20, 1996, Cristobal denied plaintiff's claim for long term benefits based on the medical information submitted and on a review of records relating to Robinson's claim for unemployment benefits. In denying Robinson's claim, Cristobal concluded that Robinson had not met the definition of total disability contained in the policy. Cristobal stated that his conclusion was based on the numerous medical records produced, on the opinion reached by Dr. Silverman in reviewing the medical information supplied and on information secured from the Maryland Unemployment Office. Robinson was told that if he disagreed with the determination made, he should advise Phoenix in writing, setting forth his objections.

By letter dated December 20, 1996, plaintiff's attorney appealed defendant's denial of benefits, arguing that such denial was arbitrary and capricious. That letter requested certain documents from Phoenix, including copies of the policy, medical reports and Dr. Silverman's report. Cristobal responded by letter dated January 13, 1997, furnishing the requested documents and stating that Phoenix did not concur with the arguments advanced by plaintiff in support of his appeal. There was later correspondence between Phoenix and plaintiff's lawyer in which plaintiff was invited to supply any additional information which had not been previously made available. However, no such additional information was provided by plaintiff or his attorney. Rather, plaintiff filed this civil action in this Court on April 11, 1997.

On the record here, this Court finds and concludes that the decision reached by defendant Phoenix in denying plaintiff's claim for benefits was the result of a deliberate, principled reasoning process. Plaintiff's claim was denied after a lengthy and thorough review of information pertinent to the substance of Robinson's claim. Faced with Robinson's contention that, at the time of his discharge, he was totally disabled under the terms of the policy, Cristobal undertook a detailed investigation of Robinson's extensive medical history. Cristobal first secured records from the six doctors and two hospitals listed in Robinson's application, and later obtained medical records from three other health care providers. When he learned that, shortly after he was fired, Robinson had sought unemployment benefits, Cristobal obtained pertinent records from the Maryland Unemployment Office, including the report of Dr. Arnold Kirshenbaum who had treated plaintiff less than two weeks after he left the employ of General Heating.

Reports were received from Dr. Robert Gerwin who had opined that plaintiff was totally disabled, and Cristobal personally interviewed Dr. Gerwin. Cristobal also met with a representative of General Heating and was advised of the reasons for the termination of Robinson's employment in October of 1994. All of the medical records which had been obtained were turned over to Dr. Silverman for consideration by him. Dr. Silverman reviewed plaintiff's entire medical history and in his report undertook to differentiate between substantiated impairments which might be disabling and unsubstantiated medical problems.[9]

Following his investigation, Cristobal denied plaintiff's claim for the reasons stated in his letter of September 20, 1996. Thereafter, plaintiff and his attorney were permitted to appeal and were repeatedly invited to furnish additional information. Indeed, there was correspondence between plaintiff's attorney and Phoenix as late as March of 1997.

Under the circumstances here, the review process followed by Cristobal can hardly be

---

9. Plaintiff complains that Dr. Silverman did not address the diagnosis of fibromyalgia. However, there was no need to do so. Neither plaintiff's claim nor Dr. Gerwin's 1995 and 1996 reports mentioned fibromyalgia as the cause of plaintiff's alleged disability.

characterized as cursory and unreasoned. It was thorough and focused and evinced a reasoning process which was both deliberate and principled. Moreover, Phoenix complied with provisions of the policy which required that an unsuccessful claimant receive a written explanation of the reasons for the denial of his claim and be afforded the right to have the fiduciary reconsider the adverse decision.

■ Plaintiff argues that defendant's review of his claim was flawed because defendant did not have him examined by an independent medical examiner. There is no merit to this contention. Plaintiff's claim was based on the assertion that he was totally disabled at the time of his discharge in 1994. It would have been only marginally relevant to plaintiff's medical condition in 1994 to have had an independent examination made two years later in 1996. Moreover, there was already in the claim file before Cristobal an independent medical examination which was highly relevant to plaintiff's medical condition in 1994. Dr. Kirshenbaum examined and treated plaintiff only two weeks after he was discharged. In the report submitted by him to the Maryland Unemployment Office, he certified that Robinson's medical condition was such that he was able to work full time commencing on November 15, 1994. Dr. Kirshenbaum further stated that it was his understanding that Robinson had not been advised to leave his prior job because of illness, injury or any other physical condition.

Plaintiff contends that there should have been an independent medical examination to determine if he was suffering from fibromyalgia or myofascial pain syndrome. However, Dr. Gerwin's 1995 and 1996 reports did not diagnose Robinson as suffering from these conditions when he left the employ of General Heating. The claim filed by plaintiff sought disability benefits because of "chronic generalized pain" and not because of any particular medical condition.

As noted, under the Phoenix policy plaintiff was required to establish that he became totally disabled while employed by General Heating. It was therefore his prior medical history which was relevant to that claim. Since Cristobal had in the documents under review the results of Dr. Kirshenbaum's physical examination of plaintiff undertaken in November of 1994 shortly after plaintiff left the employ of General Heating, there was no need to have another independent medical examination undertaken two years later.[10]

### (c)

### *Supporting Evidence*

■ Having concluded that the process followed by Phoenix in rejecting plaintiff's claim was a principled and reasoned one, this Court must next determine whether the decision was based on substantial evidence. That there was evidence before Cristobal in the form of Dr. Gerwin's reports which supported plaintiff's claim is not decisive. The question to be determined by the Court is whether, in spite of the medical reports relied upon by the plaintiff, there was other evidence which was substantial and which supported the decision reached by Cristobal.

It is apparent from a review of Cristobal's letter of September 20, 1996 that he attached particular significance to facts contained in the record pertaining to Robinson's application for unemployment benefits filed with the Maryland Unemployment Office. In that application dated December 14, 1994, Robinson stated that he was then able to work full time, that he was seeking safety and security work as well as administration work, that he could work all hours, days and shifts required in the type of work which he was seeking, and that he did not expect to receive any disability payment from an employer for whom he had worked during the last eighteen months. He listed General Heating as his prior employment and gave his last day of work as October 28, 1994. He stated that he had been discharged because "I was out

---

10. Plaintiff argues that little weight should have been given to Dr. Kirshenbaum's report because he was "an allergist." However, it does not appear from the record here that Cristobal was aware of the specialty of Dr. Kirshenbaum. In

any event, the doctor was a practicing physician who had examined plaintiff and who certified to the Maryland Unemployment Office that plaintiff was capable of performing full time work.

sick (2) times in one month with bronchitis-pneumonia; was told by my supervisor that was too much sick leave (out 4 working days)."

Dr. Kirshenbaum's report of December 20, 1994 had been submitted to the Maryland Unemployment Office. As noted, Dr. Kirshenbaum had certified in that report that Robinson was able to work full time and that he had been released to return to work as of November 15, 1994. Records of the Maryland Unemployment Office included copies of weekly work verification forms covering the period from December 24, 1994 through November 18, 1995. In each of these many forms, Robinson had certified that he was ready, willing and able to work full time. Robinson had in addition identified over 50 potential employers with whom he had unsuccessfully sought employment during the eleven month period in question.

Plaintiff argues that his claim for disability benefits was not compromised by statements made by him in his claim for unemployment benefits because he was merely seeking less demanding alternate employment when he filed his application with the Maryland Unemployment Office. The record here refutes that contention. Plaintiff stated that during 1995 he unsuccessfully sought employment from some 50 different entities. Many of the jobs sought by plaintiff during that period involved work similar to that being performed by him when employed by General Heating. Indeed, in weekly verification forms filed with the Maryland Unemployment Office, plaintiff repeatedly stated that the type of work which he was actively seeking in 1995 was "safety-security" or "safety" or "security." This was precisely the type of work which he had been performing while employed by General Heating and which he now claims he was not able to perform because of his disability.

Cristobal further relied on the fact that Robinson, in spite of his claim that he was totally disabled in October of 1994, went skiing at Lake Tahoe in October of 1995. According to the report of Dr. Viener, Robinson was injured during that ski trip when he was cut-off, forced off the trail and impacted several trees, suffering deep lacerations to his face and neck for which he had surgery. Robinson was treated for those injuries by Dr. Viener, by Dr. Wongananda and at the Laurel Regional Wound Care Center.

Relevant information had also been received by Cristobal from General Heating, Robinson's former employer. Cristobal was told that Robinson had not been discharged because he was totally disabled. Rather, Robinson's employment had been terminated because of his behavior and emotional state, resulting in part from his over-use of narcotic medications. General Heating's representative disagreed with Robinson's assertion that his physical health prevented him from doing his job. That chronic pain was not the cause of plaintiff's discharge is confirmed by a statement contained in Robinson's application for unemployment benefits. He there stated that the reason for his discharge was the fact that he was "out sick (2) times in one month with bronchitis-pneumonia" and that he was told by his supervisor that "that was too much sick leave."

Further support for Phoenix's decision is found in the report of Dr. Silverman. Following his review of plaintiff's medical records, Dr. Silverman concluded that there was little objective medical evidence to support a claim of total disability, although there did appear to be "psychosocial issues." From its independent examination of the medical records reviewed by Dr. Silverman, this Court concludes that they provide ample support for the opinions reached by him.

Plaintiff argues that no weight should be given to Dr. Silverman's conclusions based on his "objective" analysis of plaintiff's symptoms and medical history. According to plaintiff, there is no requirement in the policy that a claim seeking disability benefits be supported by objective findings. There is no merit to these contentions. Certainly, it was reasonable for Phoenix in the exercise of its discretion to give more weight to objective medical findings than to determinations based on subjective complaints. *See Pokol v. E.I. duPont de Nemours & Co., Inc.,* 963 F.Supp. 1361, 1372 (D.N.J.1997). As the Court noted in *Ellis,* 126 F.3d at 234, an ERISA determination of the sort involved here should be made by an "objectively rea-

sonable decision maker." The more incentive that a fiduciary might have to benefit itself by an interpretation of benefit eligibility, "the more objectively reasonable" the fiduciary's decision must be. *Id.* at 233. It was therefore not only reasonable but also in accordance with applicable law for Dr. Silverman to base his conclusions on an objective analysis of plaintiff's medical history.

Plaintiff further argues that defendant Phoenix has at all times acted as an adversary and could not fairly and impartially evaluate his claim because of this adversarial relationship. In particular, plaintiff notes that defendant formally charged him with fraud in a letter addressed to the Maryland Insurance Administration ("the MIA"). Based on the assertion that the MIA denied Phoenix's claim of fraud, plaintiff contends that defendant's charge was baseless and motivated by an adversarial bias.

On September 23, 1996, which was several days after plaintiff's claim for benefits was denied by defendant Phoenix, Cristobal addressed a letter to the MIA. Based on allegations of wrongdoing and various misrepresentations of Robinson, Cristobal charged in that letter that Robinson had acted in a fraudulent manner by, *inter alia*, "double dipping to collect both Unemployment and Long Term Disability benefits..."

The record before this Court indicates that Phoenix was entirely justified in charging Robinson with fraud. Pursuant to a Maryland statute, an insurance company is required to report suspected insurance fraud. Md.Code Ann., Ins. § 27–802(a)(1)(1997). Representations made by Robinson to the Maryland Unemployment Office in support of his claim for unemployment benefits differed materially from representations made by him to defendant Phoenix in support of his claim for disability benefits. Moreover, the MIA did not "deny" Phoenix's claim of fraud. Rather, after an investigation, the MIA in August of 1997 merely decided not to file criminal charges against Robinson. That decision has little relevance to this Court's determination that plaintiff repeatedly misrepresented material facts in applying for unemployment and disability benefits. Any adversarial relationship which arose between plaintiff and defendant was the result of plaintiff's own conduct.

Because of inconsistencies in the two reports of Dr. Gerwin, Cristobal was justified in refusing to give them decisive weight.[11] In his report of February 24, 1995, Dr. Gerwin stated that, although he considered Robinson to be totally disabled at the time, he expected a fundamental change in the future. Dr. Gerwin opined in that report that Robinson could be expected to recover within one to three months and be able to perform duties of his job and those required by any other work. However, in his report of February 20, 1996, which was after Robinson had suffered serious injuries in a ski accident, Dr. Gerwin was of the opinion that Robinson was totally disabled and that no fundamental or marked change could be expected in the near foreseeable future.

The significant facts and circumstances detailed hereinabove support the decision reached by Phoenix that plaintiff was not totally disabled when he left the employ of General Heating in October of 1994. This Court accordingly concludes that Phoenix's denial of plaintiff's claim was based on substantial evidence.

### (d)

### *Conflict of Interest Factor*

Undoubtedly, Phoenix stood to gain financially from the denial of plaintiff's claim. The conflict of interest factor must therefore be considered by the Court in this case. The deference normally given to a discretionary decision of the sort involved here must accordingly be lessened. *Ellis,* 126 F.3d at 233. Nevertheless, as a fiduciary, Phoenix is required to serve the best interests of all plan beneficiaries and not just the best interests of one potential beneficiary. *Id.* at 234.

█ The approach which this Court must follow in a case of this sort is that outlined in both *Bedrick,* 93 F.3d at 152, and *Ellis,* 126

---

**11.** The fact that conflicting data has been submitted by a claimant may be considered by a fidu-

ciary in rejecting a claim. *Ellis,* 126 F.3d at 234.

F.3d at 233–34. In view of the conflict of interest factor which exists in this case, this Court will review the decision of Phoenix to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. 93 F.3d at 152, 126 F.3d at 233–34.

■ Applying that standard, this Court concludes that defendant Phoenix did not abuse its discretion in rejecting plaintiff's claim for disability benefits. Although plaintiff in the claim filed with Phoenix in June of 1996 had asserted that his disabling pain was long-standing and had become severe and chronic in 1991, counsel for plaintiff now contends that he became totally disabled shortly before he was discharged in October of 1994. However, there is nothing in plaintiff's medical records revealing the onset of a totally disabling condition in September and October of 1994.

Based on plaintiff's medical history, on the statements he made in seeking unemployment benefits, on the report of Dr. Kirshenbaum, on plaintiff's activities after his discharge and on inconsistencies in the reports of Dr. Gerwin, a fiduciary free of any conflict of interest would have acted reasonably in rejecting plaintiff's claim and thereby preserving the plan's funds for those beneficiaries who satisfy the plan's definition of "totally disabled." *Ellis*, 126 F.3d at 234. Accordingly, consideration by the Court in this case of the conflict of interest factor does not alter the Court's conclusion that substantial evidence supported the decision reached by Cristobal.

V

*Conclusion*

For all the reasons stated herein, this Court concludes that the decision of defendant Phoenix which denied plaintiff's claim for benefits under his employer's disability plan was the result of a deliberate, principled reasoning process, that the decision was based on substantial evidence and was therefore reasonable and that Phoenix did not abuse its discretion in reaching that decision. Accordingly, defendant's motion for summary judgment will be granted and plaintiff's motion for summary judgment will be denied. An appropriate Order will be entered by the Court.