**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 1 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

KATHY A. WELCH,

Plaintiff-Appellee,

v.

No. 02-3220

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 00-1439-DWB)**

---

Lynn D. Preheim (Geron J. Bird with him on the brief), Stinson Morrison Hecker
LLP, Wichita, Kansas, for Defendant-Appellant.

Kurt A. Harper, Sherwood & Harper, Wichita, Kansas, for Plaintiff-Appellee.

---

Before **HENRY, BRISCOE,** and **McCONNELL,** Circuit Judges.

---

**HENRY**, Circuit Judge.

---

Plaintiff-appellee Kathy A. Welch was an employee of the Coleman

Company and was eligible for coverage under Coleman's long-term disability

("LTD") insurance plan. Coleman's plan was issued and administered by defendant-appellant UNUM. Ms. Welch suffers from fibromyalgia and went on disability leave on January 31, 1998. At the time she submitted her claim, the LTD plan provided for benefits until Ms. Welch turned sixty-five, and in no case less than sixty months. In August 1998, UNUM and Coleman amended the LTD plan through "Amendment 23," which replaced the old plan with a new plan and which contained a 24-month limitation period for payments on "disabilities, due to sickness or injury, which are primarily based on self-reported symptoms." Aplt's App. vol. I, at 143. The effective date of Amendment 23 was retroactive to January 1, 1998, and it stated that "[c]laims for disabilities that occur prior to January 1, 1998 [would] be determined according to the policy(ies) in effect prior to this amendment." *Id*. at 118. Subsequent to the enactment of Amendment 23, UNUM notified Ms. Welch that her long-term disability benefits would only be paid through July 29, 2000, because her disability qualified under the amended plan's "self-reported symptoms" limitation.

In September 2000, Ms. Welch filed suit against UNUM, seeking a declaration that she is entitled to LTD benefits under the pre-amendment plan ("the initial plan"), not the post-amendment plan ("the new plan"). She also argued that even if the court should decide that the new plan controls, her condition of fibromyalgia does not fall within the self-reported symptoms

limitation.

Ms. Welch and UNUM both filed motions for summary judgment, and the magistrate judge granted Ms. Welch's motion and denied UNUM's. The magistrate judge found that the LTD plan provided that benefits would vest upon the plan's termination and that Amendment 23 caused the initial plan to terminate. Therefore, the magistrate judge found that UNUM could not retroactively apply Amendment 23 to deprive Ms. Welch of vested benefits, and he ordered that UNUM pay her benefits in accordance with the initial plan. UNUM now appeals. Because we disagree with the lower court that Amendment 23 caused the plan to terminate, we reverse and remand.

## I. BACKGROUND

At all pertinent times, Ms. Welch was an employee of the Coleman Company. On March 1, 1979, Coleman entered into an agreement with UNUM to provide LTD insurance for all full-time employees. Ms. Welch became eligible for this insurance on September 11, 1980.

Prior to the enactment of Amendment 23 in August 1998, the LTD plan provided that for an employee who became disabled before the age of sixty, the maximum benefit period was until age sixty-five, but not less than sixty months. Aplt's App. vol. I, at 49. This initial plan contained a termination provision

3

which stated, "[t]ermination of this policy under any conditions will not prejudice any payable claim which occurs while this policy is in force." *Id*. at 63. It also contained a provision stating that the "policy may be changed in whole or in part." *Id*. at 65.

On January 31, 1998, Ms. Welch became disabled, claiming that she was no longer able to work due to fatigue, joint pain, and headaches. On or about July 23, 1998, UNUM received Ms. Welch's claim for LTD benefits. She reported that she was unable to work due to chronic pain and extreme fatigue. Ms. Welch was diagnosed with fibromyalgia, which is a "chronic pain disorder" characterized by "[w]idespread musculoskeletal pain and excess tenderness" and fatigue. *Id*. at 317-18.

In a letter dated September 25, 1998, UNUM notified Ms. Welch that her claim for disability benefits had been approved retroactive to July 30, 1998. *Id*. at 161. The LTD plan provides for a 180-day elimination period, which is a "period of consecutive days of disability for which no benefit is payable. The elimination period . . . begins on the first day of disability." *Id*. at 52. Because Ms. Welch became disabled on January 31, 1998, her elimination period did not conclude until July 29, 1998. The letter also gave an explanation of how Ms. Welch's benefits were calculated and when to expect monthly benefits checks, as well as notice that ongoing benefits were conditioned upon her ability to meet the

definition of disability and that the maximum period of payment was to age sixty-five. *Id*. at 161-62.

On August 6, 1998, the LTD plan was amended by UNUM and Coleman. The amendment, referred to as Amendment 23, stated that "[t]he entire policy is replaced by the policy attached to this amendment." *Id.* at 118. Amendment 23 contained a twenty-four-month limitation period for payments on "disabilities, due to sickness or injury, which are primarily based on self-reported symptoms." *Id.* at 143. Amendment 23 defined "self-reported symptoms" as

> the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures, or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

*Id*. at 144. Amendment 23 provided that "[t]he effective date of these changes is January 1, 1998." *Id*. at 118. Claims for disabilities which occurred prior to that date were to be determined according to the initial plan, while claims for disabilities which occurred after that date were to be determined with reference to Amendment 23. *Id*.

On April 23, 1999, UNUM wrote to Ms. Welch about the status of her LTD claim. *Id*. at 170-71. The letter informed her that her benefits, assuming her condition remained the same, would only be paid through July 29, 2000. *Id*. The letter explained that the plan under which UNUM would be providing benefits

5

had a twenty-four-month limitation for disabilities based on self-reported symptoms and that the medical information contained in Ms. Welch's file with UNUM indicated that her disability fell within the limitation. *Id*.

On September 17, 1999, Ms. Welch requested UNUM to reconsider its decision to limit her benefits pursuant to the "self-reported symptoms" limitation. *Id*. at 328-331. She asserted that this limitation was not included in the plan summary available to Coleman or to her at the time she left Coleman and thus should not be applied to her. *Id*. Ms. Welch also disputed UNUM's position that her illness was not verifiable, and she enclosed copies of medical records from November 1992, January 1995, July 1997, and June 1999, as well as copies of letters from her doctor. *Id*.

In a letter dated November 12, 1999, UNUM advised Ms. Welch that it had reviewed the information she had provided, along with the medical records previously contained in her file. *Id*. at 337-38. However, UNUM stated that Ms. Welch's claim would continue to be paid under the self-reported symptoms limitation since "an organic etiology for [her] symptoms ha[d] not been determined." *Id*. at 337. While acknowledging that Ms. Welch was diagnosed with fibromyalgia, UNUM asserted that "the severity of your Fibromyalgia is based solely on your self reported symptoms." *Id*. After several more such exchanges, UNUM sent Ms. Welch a letter dated September 6, 2000, stating that

after completing its review, UNUM's original decision to deny Ms. Welch's continued benefits was appropriate. *Id*. at 364-65. The letter also stated that "because Ms. Welch is claiming disability as of January 31, 1998, she is subject to the provisions of the policy dated January 1, 1998." *Id*. at 365.

On September 22, 2000, Ms. Welch filed suit in the District Court of Sedgwick County, Kansas, seeking a declaratory judgment that UNUM had improperly discontinued her LTD benefits. UNUM removed to the federal district court for the District of Kansas pursuant to 28 U.S.C. § 1441 on the undisputed ground that the suit implicates the Employee Retirement and Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461. Both parties submitted motions for summary judgment to the magistrate judge hearing the case. The magistrate judge ruled in favor of Ms. Welch and against UNUM.

The magistrate judge found that UNUM had the power to retroactively amend the LTD plan. However, he found that "[c]ourts, in a variety of contexts, have rejected retroactive application of modifications if it affects benefits that have vested or already become due." Aplt's App. vol. II, at 566 (Magistrate Judge's Mem. & Order, filed Mar. 13, 2002) (citing *Chiles v. Ceridian Corp., Inc*., 95 F.3d 1505 (10th Cir. 1996)). The magistrate judge found that the termination provision of the initial LTD plan provided that benefits would vest if and when the plan was terminated. Additionally, the court found that "[w]hen

7

Amendment 23 was enacted on August 6, 1998, the [initial] policy was replaced in its entirety and was therefore terminated." *Id*. at 576. Therefore, the magistrate judge ruled that Ms. Welch's benefits had vested and that UNUM's retroactive application of Amendment 23 improperly deprived her of her vested benefits. He declared that Ms. Welch's LTD "benefits cannot be limited to 24 months under the self-reported symptom provision of the new 1998 plan," and that she was "entitled to receive [benefit payments] each month until she reaches age 65, but not less than 60 months, as long as she continues to be disabled as defined by the provisions of the pre-1998 plan." *Id*. at 579. UNUM filed a motion to alter or amend judgment, which the magistrate judge denied.

UNUM now appeals, asserting that (1) the magistrate judge improperly held that Ms. Welch's benefits under the initial plan vested upon termination, (2) the magistrate judge improperly held that the initial plan was terminated by the enactment of Amendment 23, and (3) the magistrate judge, as a matter of law, should have entered summary judgment for UNUM. Because we agree that the initial plan did not terminate, we reverse the grant of summary judgment in favor of Ms. Welch. However, because the magistrate judge did not determine whether it was arbitrary and capricious for UNUM to apply Amendment 23's self-reported symptoms limitation to Ms. Welch's claim for benefits based on her condition of fibromyalgia, we also remand to the district court for further proceedings

8

consistent with this opinion.

## II. DISCUSSION

### A.    Standard of review

"We review de novo the district court's grant of summary judgment, considering the evidence in the light most favorable to the appellant." *Meiners v. University of Kansas*, 359 F.3d 1222, 1229 (10th Cir. 2004).   "In interpreting the terms of an ERISA plan[,] we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law." *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996).  We "apply the de novo standard of review to interpret the terms of a plan, giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean." *Id*. (internal quotation marks and citations omitted).

### B.    Vesting Under A Welfare Benefit Plan

"ERISA regulates two types of benefit plans, pension benefit plans that create vested rights and welfare benefit plans that need not create vested rights." *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa*, 130 F.3d 950, 954 (10th Cir. 1997).  The Coleman LTD Plan is a welfare benefit plan "because disability insurance plans are considered welfare, not pension, benefits."

9

*Chiles*, 95 F.3d at 1510. Welfare benefit plans are

> exempt from the statutory vesting requirements that ERISA imposes on pension benefits. Accordingly, an employer may amend the terms of a welfare benefit plan or terminate it entirely. However, benefits under a welfare benefit plan may vest under the terms of the plan itself. . . . [and] *an amendment to any ERISA plan may not operate retroactively if that amendment deprives a beneficiary of a vested benefit.*

*Member Services*, 130 F.3d at 954 (citations and quotation marks omitted) (emphasis added). *See also Chiles*, 95 F.3d at 1510 ("Benefits provided under a welfare benefit plan need never vest. . . . An employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits."). "[P]laintiffs carry the burden of showing an agreement or other demonstration of employer intent to have company-paid [benefits] vest under the plan." *Chiles*, 95 F.3d at 1511.

Because UNUM retroactively applied Amendment 23 (which was enacted August 6, 1998) to limit benefits for Ms. Welch's disability (which began January 31, 1998), we must determine whether the Coleman/UNUM LTD plan included a contractual promise that benefits would vest upon the occurrence of some condition. "Because an employee benefit plan must be established by a written instrument, a promise to provide vested benefits must be incorporated, in some fashion, into the formal written ERISA plan." *Id.* (internal quotation marks omitted). We interpret the terms of the LTD plan de novo to determine whether the plan included a promise to vest benefits. *Id.* If it did, and if Ms. Welch's

10

benefits had indeed vested under it, then it was inappropriate for UNUM to retroactively apply Amendment 23 to Ms. Welch's claim.

UNUM contests (1) the magistrate judge's finding that the LTD plan vested benefits upon the termination of the plan; as well as Ms. Welch's arguments that the LTD plan vested benefits upon (2) the conclusion of the elimination period, and (3) the attainment of her disability. We address each contention in turn. Because we conclude that Ms. Welch's benefits were not vested under the LTD plan, we hold that it was not improper for UNUM to retroactively apply Amendment 23 to Ms. Welch's claim for benefits.

**1. Vesting Upon Plan Termination**

**a. Did the Plan Provide for Vesting Upon Plan Termination?**

The initial LTD plan contained a provision which stated, "[t]ermination of this policy under any conditions will not prejudice any payable claim which occurs while this policy is in force." Aplt's App. vol. I, at 63. The magistrate judge found that this provision constituted a contractual promise to vest benefits in the event of the plan's termination. *See* Aplt's App. vol. II, at 574 (reasoning that "a reasonable person in the position of [Ms. Welch] would read the termination provision in the [initial] plan . . . as allowing UNUM/Coleman to change the terms of the plan, but if the plan terminates, her disability benefits may not be prejudiced, *e.g.*, reduced or withdrawn, if she had a 'payable claim'

11

before the plan was terminated"). Subsequently, the magistrate found that the enactment of Amendment 23 caused the plan to terminate, triggering the vesting of Ms. Welch's benefits, such that it was improper for UNUM to retroactively apply Amendment 23 to limit Ms. Welch's disability benefits. *Id*. at 576-77. Because we hold, as discussed below, that the initial LTD plan did not terminate, it is unnecessary for us to decide whether or not the plan's termination clause included the "clear and express language" necessary to guarantee the contractual vesting of a welfare benefit. *Chiles*, 95 F.3d at 1513 (internal quotation marks omitted).

### b. Was the Initial Plan Terminated by Amendment 23?

The magistrate judge found that Amendment 23 effectively terminated the initial LTD plan and replaced it with a new plan. To reach this conclusion, the court relied on (1) the language of Amendment 23, which stated that "[t]he entire policy is replaced by the policy attached to this amendment," Aplt's App. vol. I, at 118, and (2) a review of the history of the Coleman/UNUM long-term disability plan, which showed that

> [i]n the past, some 'amendments' purported to simply modify portions of the plan by changing only specific sections of the plan and substituting a few new pages in the policy. . . . However, other 'amendments' – including Amendment 23 which is relevant here – purported by their own terms to *entirely replace the old plan*, with a completely new policy attached to the amendment.

Aplt's App. vol. II, at 576-77.

12

As the magistrate judge noted, "there is a scarcity of guidance on questions of welfare plan termination." *Chiles*, 95 F.3d at 1516. Thus, we must evaluate all of the circumstances surrounding the enactment of Amendment 23 to determine whether it actually effected a termination of the initial plan. We conclude that the factors considered by the magistrate are not dispositive of a plan termination. Rather, we hold that the facts of this case show that the LTD plan was modified, not terminated.

First we observe that UNUM did not undertake any administrative steps that would indicate that Amendment 23 terminated the initial plan and created a new plan. UNUM did not follow the guidelines set forth in the plan documents for terminating the plan. "With respect to termination of a welfare plan, ERISA only requires that '[t]he assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan except as otherwise provided in the regulations of the Secretary.'" *Chiles*, 95 F.3d at 1516 (quoting 29 U.S.C. § 1103(d)(2)). The initial Coleman LTD plan only specifies that if the company terminates the plan, it must "giv[e] written notice to the policyholder[s] at least 31 days in advance." Aplt's App. vol. I, at 63. The Coleman LTD policyholders did not receive notice of a plan termination at the time of the enactment of Amendment 23. Moreover, Coleman employees were not presented with an opportunity to opt in or out of a new plan. Although Amendment 23 made

13

substantive changes to the plan that affected particular claims for benefits, like Ms. Welch's, the employees' coverage under the plan was not disrupted in a way that would indicate that the initial plan had terminated and a new plan had been initiated.

Indeed, this case bears little resemblance to cases in which we have held that there was a plan termination. In *Chiles*, 95 F.3d at 1515-16, when an employer sold one of its divisions to another company, new trustees were appointed to a replacement LTD plan instituted by the buyer, the buyer became the administrator of the new plan, the seller transferred money to fund the new plan, and the buyer assumed all of the seller's obligations with respect to LTD plan participants. We held that "[g]iven the facts of this case, the [seller's] Plan terminated with respect to [the] division employees when [the seller] was released from its obligation to fund the plan with respect to those employees and the employees could look to the [buyer's] LTD Plan for benefits." *Id*. at 1516. *Accord, Courtney v. Am. Airlines, Inc*., 40 F. Supp. 2d 389, 396 (N.D. Tex. 1999) (holding that LTD plan terminated upon the merger of two companies). Clearly, none of these factors are present in the case at bar. The enactment of Amendment 23 did not affect Coleman's control of the plan or its obligations under it. Accordingly, we cannot find that the plan "terminated" under the reasoning of *Chiles*.

14

Finally, we note that the changes to the plan were effected by an *amendment*. Despite UNUM's choice of words that the amendment "entire[ly] . . . replaced" the initial plan, Aplt's App. vol. I, at 118, it is apparent that UNUM intended to merely modify or amend the initial plan, not to end it and institute a completely new one. In fact, Amendment 23 seems to have made few substantive changes to the plan. For instance, the benefit percentage remains the same, as does the waiting period, the elimination period, and the maximum benefit period. *Compare* Aplt's App. vol. I, at 48-49 *with id*. at 123. Although the language on the face of Amendment 23 indicated that "[t]he entire policy is replaced by the policy attached to this amendment," *id*. at 118, and a complete copy of the new plan was attached to Amendment 23, we deem it plausible that UNUM used these words to indicate its intention to provide Coleman's employees with a complete, integrated copy of the plan in the interest of convenience. This wording is not ideal, but it does not amount to termination of the plan, especially since UNUM retained the right to change the plan "in whole or in part." *Id*. at 65.

Taking into account all of the circumstances, we hold that Coleman's initial LTD plan was amended, not terminated, by Amendment 23. Therefore, assuming without deciding that the initial LTD plan contained language sufficient to contractually vest Ms. Welch's benefits upon plan termination, the enactment of Amendment 23 would not have triggered the vesting of Ms. Welch's benefits.

**2. Vesting at the Conclusion of the Elimination Period or Upon Ms. Welch's Disability**

UNUM contests Ms. Welch's arguments, which she raised below and which she reasserts on appeal, that her LTD benefits "were capable of vesting and did vest, at the conclusion of the waiting [i.e. elimination] period," Aple's Br. at 15, or upon the date she became disabled. *Id.* at 16-17.

We reiterate that "[a]n employer or plan sponsor may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits." *Chiles*, 95 F.3d at 1510. With regard to the payment of disability benefits, the initial LTD plan provides that

> When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:
> 1. disability; and
> 2. regular attendance of a physician.
> . . .
> Disability benefits will cease on the earliest of:
> 1. the date the insured is no longer disabled;
> 2. the date the insured dies;
> 3. the end of the maximum benefit period;
> 4. the date the insured's current earnings exceed 80% of his indexed pre-disability earnings;
> 5. the date the insured receives retirement benefits under the employer's retirement plan due to his voluntary election to receive such benefits.

Aplt's App. vol. I, at 57, 60. The plan also advises that "[t]his policy may be changed in whole or in part." *Id.* at 65.

16

"Contractual vesting of a welfare benefit is an extra-ERISA commitment that must be stated in clear and express language. . . . [It] is a narrow doctrine." *Chiles*, 95 F.3d at 1513 (internal quotation marks omitted). There is no language in the LTD plan that provides for the vesting of claims for benefits upon disability or at the end of the elimination period, and the plan specifically reserves UNUM's right to change the plan. We cannot read a vesting requirement into the contract. *See id.* (declining to read LTD plan as providing for vesting upon the unexpressed condition of attaining disability when the plan "clearly pinpoint[ed] plan termination, not employee disability, as the vesting trigger"). Therefore, we hold that Ms. Welch's benefits did not vest upon her attaining disability or at the conclusion of the elimination period.[1]

## C.    Application of Amendment 23

As detailed in the foregoing discussion, we hold that Ms. Welch's benefits

---

[1] Because the magistrate judge found that UNUM could not retroactively apply Amendment 23 to limit Ms. Welch's claims, he did not address the merits of Ms. Welch's argument that her benefits vested pursuant to language contained in Amendment 23 that "[a]ny decrease in coverage will take effect immediately but will not affect a payable claim that occurs prior to the decrease." Aplt's App. vol. I, at 132. The magistrate judge merely stated that "Plaintiff has repeatedly asserted that the *old plan* is the one applicable to her. The [above language] is part of the *new plan*." *Id.* vol. II, at 571-72. Because we hold that UNUM properly applied Amendment 23 to Ms. Welch's claims, Ms. Welch's argument may remain tenable. We note that there is no indication in the record that UNUM actually considered this policy language when it was considering whether to limit the benefit period for Ms. Welch's disability payments.

17

were not vested under the LTD plan.  Accordingly, we hold that it was not improper for UNUM to retroactively apply Amendment 23 to Ms. Welch's claims, because it did not deprive her of *vested* benefits.  *Member Services*, 130 F.3d at 954.  However, the question remains as to whether UNUM appropriately applied Amendment 23's self-reported symptoms limitation to Ms. Welch's claim for disability benefits based upon a diagnosis of fibromyalgia.

Amendment 23's twenty-four-month self-reported symptoms limitation applies to payments on "disabilities, due to sickness or injury, which are primarily based on self-reported symptoms."  Aplt's App. vol. I, at 143.  "Self-reported symptoms" are defined as

> the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures, or clinical examinations standardly accepted in the practice of medicine.  Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

*Id*. at 144.

UNUM contends that Ms. Welch "could present no evidence, other than 'self-reported symptoms' to justify continuation of her disability benefits" for fibromyalgia.  Aplt's Br. at 26.  Ms. Welch, on the other hand, contends that her "condition is confirmed by the results of a variety of objective tests performed over a period of time, showing varying degrees of connective tissue and inflammatory disease."  Aple's Br. at 19.  "Because proving the disease is

18

difficult . . . , fibromyalgia presents a conundrum for insurers and courts evaluating disability claims." *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999). *Compare id.* (holding that "no objective test exists" for proving fibromyalgia); *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2004) ("[F]ibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("[A] growing number of courts, including our own, . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'") (quoting *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988)); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (noting that fibromyalgia "itself can be diagnosed more or less objectively by the 18-point test . . . , but the amount of pain and fatigue that a particular case of it produces cannot be"); *and McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 562 (7th Cir. 2000) (holding that fibromyalgia's "cause is unknown, there is no cure, and the symptoms are entirely subjective"); *with Boardman v. Prudential Life Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical

19

limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) (noting that Social Security claimant's testimony and reports to the Social Security Administration were "supported by objective medical evidence of fibromyalgia"); *and Russell v. UNUM Life Ins. Co. of Am.*, 40 F. Supp. 2d 747, 751 (D.S.C. 1999) (considering a nearly identical self-reported symptoms limitation and holding that fibromyalgia is an objectively diagnosable condition).

There is no dispute that the Coleman LTD plan gives UNUM discretionary authority to determine eligibility for benefits and to construe the terms of the plan. Aplt's App. vol. I, at 50. However, in making those discretionary determinations, UNUM, as the plan administrator and insurer, operates under a conflict of interest. *Pitman v. Blue Cross and Blue Shield of Okla.,* 217 F.3d 1291, 1296 n.4 (10th Cir. 2000) (holding that when one party serves "as both insurer and administrator of the plan, there is an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound"). In these circumstances, under our circuit's "sliding scale" approach, a court reviewing a benefits determination "will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict." *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir.

1996).

In this case, the magistrate judge's finding that Amendment 23 could not be applied to Ms. Welch "obviate[d] the need to decide whether fibromyalgia falls within the self-reported symptom limitation of the new plan." Aplt's App. vol. II, at 579. Therefore, the lower court never applied the arbitrary and capricious standard to UNUM's benefits determination for Ms. Welch.

"As a general rule, we do not consider issues not passed on below, and it is appropriate to remand the case to the district court to address an issue first." *N. Tex. Prod. Credit Ass'n v. McCurtain County Nat'l Bank*, 222 F.3d 800, 812 (10th Cir. 2000). Accordingly, we remand the case to give the district court the opportunity to consider the evidence and arguments of the parties regarding UNUM's determination that fibromyalgia falls into the self-reported symptoms limitation.

## III. CONCLUSION

We hold that (1) even assuming, without deciding, that the Coleman LTD plan vested benefits upon the plan's termination, Ms. Welch's benefits did not vest because Amendment 23 did not cause the initial plan to terminate, and (2) the LTD plan did not provide for benefits to contractually vest upon disability or at the end of the elimination period. Therefore, we REVERSE the magistrate

21

judge's grant of summary judgment to Ms. Welch and REMAND the case for further proceedings consistent with this opinion.